BRETT A. SHUMATE
Assistant Attorney General
Civil Division

JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
JARED S. WIESNER (District of Columbia Bar No. 976856)
PATRICK T. O'HARE (Texas Bar No. 24131554)
Attorneys, Civil Division
United States Department of Justice
P.O. Box 261
Ben Franklin Station
Washington, DC 20044
Phone: 202-353-1274
Fax: 202-541-0280
jared.s.wiesner2@usdoj.gov

*Attorneys for the United States*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

| | |
|---|---|
| United States of America ex rel. Bryan Quesenberry,<br><br>        Plaintiffs,<br><br>    v.<br><br>Passive Income Advisors, LLC, and Gena Lofton,<br><br>        Defendants. | Case No. 2:20-cv-01537-RFB-MDC<br><br>**PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT**<br><br>**ORAL ARGUMENT REQUESTED** |

## INTRODUCTION

Plaintiff, the United States of America, submits this motion for summary judgment as to false claims and records related to Defendants' application for a Paycheck Protection Program ("PPP") loan. The undisputed evidence shows that Defendants violated the False Claims Act and were unjustly enriched by filing a PPP loan application based on materially false statements and certifications of compliance and, when informed of their obligation to return the funds, refused to pay back the loan, resulting in the government incurring damages in the amount of $1,235,998.97, which includes the loan amount and lender processing fee. The United States seeks summary judgment as to all claims.

## STATEMENT OF UNDISPUTED FACTS

1. The PPP was launched by the United States Small Business Administration ("SBA") in April 2020.  Paycheck Protection Program, 85 Fed. Reg. 20811, 20812 (Apr. 15, 2020).

2. A business was eligible for a PPP loan if, among other things, it was "in operation on February 15, 2020 and either had employees for whom [it] paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." (*Id.*)

3. A business was limited to a maximum loan of its average monthly payroll cost (excluding payments to contractors) for the preceding year, multiplied by 2.5. (*Id.* at 20812–13.)

4. Greater Nevada Credit Union ("Greater Nevada") was a PPP lender authorized by SBA.  (Declaration of Martin Andrews ("Andrews Decl.") ¶ 4 (attached as Exh. 1).)

5. Defendant Gena Lofton is the sole owner of Defendant Passive Income Advisors ("PIA").  (Transcript of Deposition of Gena Lofton ("Lofton Tr.") 18:17–23, (excerpts attached as Exh. 2).)

6. PIA solely collected royalties and income from "digital sales" related to a book published by Lofton from its creation until after the first quarter of 2020, when it began to manage rental properties owned by Lofton.  (Lofton Tr. 20:9–19, 21:25–22:12.)

7. PIA submitted an application for a PPP loan requesting $1,200,000 on May 11, 2020, to Greater Nevada.  (PIA PPP Loan Application at 1–2 (attached as Exh. 3).)

8. Lofton signed the application on behalf of PIA as its owner.  (*Id.* at 2.)

9. Lofton represented to Greater Nevada and certified that PIA "was in operation on February 15, 2020 and had employees for whom it paid salaries and payroll taxes or paid independent contractors as reported on Form(s) 1099-MISC." (*Id.*)

10. Lofton represented that PIA had five employees.  (*Id.* at 1.)

11. PIA had no employees on February 15, 2020.  (Lofton Tr. 26:15–27:20.)

12. Lofton represented that PIA's average monthly payroll cost was $1,000,000.00.  (PIA PPP Loan Application at 1.)

13. Defendants state that the payroll number on the PIA PPP Loan Application was a "typo that should have stated $480,000."  (RFA Responses at 3 (attached as Exh. 4).)

14. PIA had "zero dollars of monthly payroll" when Defendants applied for the PIA PPP Loan.  (Lofton Tr. 37:5–7.)

15. Defendants state that PIA had five "contractors" at the time of the PIA PPP Loan Application.  (Lofton Tr. 37:8–11; RFA Responses at 3.)

16. PIA had no contractors reported to the Internal Revenue Service ("IRS") on February 15, 2020, and reported no "payments in 2019 that would require [PIA] to file Form(s) 1099" and no "payments in 2020 that would require [PIA] to file Form(s) 1099." (Lofton Tr. 52:14–54:11; PIA Schedule C (Form 1040) 2019 and 2020, (attached as Exhs. 5, 6).)

17. Lofton certified that PIA was "eligible to receive a loan under the rules in effect at the time this application is submitted that have been issued by the Small Business Administration (SBA) implementing the Paycheck Protection Program."  (PIA PPP Loan Application at 2.)

18. Lofton certified that "the information provided" in the PIA PPP Loan Application was "true and accurate in all material respects." (*Id.*)

19. Lofton stated she used "projections for the actual number of employees that I was planning to hire" to calculate the requested loan value and that she "subjectively believe[d]" she was in compliance with SBA guidelines.  (Lofton Tr. 36:2–15, 193:12–21; Declaration of Gena Lofton ("Lofton Decl.") ¶ 12 (attached as Exh. 7).)

20. Lofton read the instructions included in the PIA PPP Loan Application, which do not include any reference to "future costs."  (Lofton Tr. 34:5–14, 76:5–12.)

21. Lofton reviewed SBA guidance for § 7(a) loans, SOP 50 10 5(K), Subpart B, Chapter 2, Section III(h), effective April 1, 2019, before applying for the PPP. (Lofton Decl. ¶ 12; Lofton Tr. 150:1–7.)

22. Section III(h) permitted the use of revenue projections to determine if a business "engaged in renting or leasing" was "one of the types of businesses listed as ineligible in SBA regulations." (SOP 50 10 5(K) at 105–06 (excerpts attached as Exh. 8).)

23. Section III(h) did not address the amount of loan funds an eligible business could receive. (*Id.*; Lofton Tr. 152:9–18.)

24. Lofton did not recall any SBA guidance related to projections for how much money a PPP borrower could receive. (Lofton Tr. 152:9–18.)

25. Greater Nevada approved the PIA PPP Loan and PIA received $1,199,999. (Lofton Decl. ¶ 14; Lofton Tr. 36:2–8.)

26. Lofton signed a Promissory Note (the "Note") on behalf of PIA agreeing to pay back the PIA PPP Loan "subject to any Loan forgiveness granted by" SBA. (PIA PPP Loan Promissory Note at 1, 4 (attached as Exh. 9).)

27. Lofton agreed that the Note would "inure to the benefit of [Greater Nevada] and its successors and assigns," and the Note expressly contemplated that SBA may become the holder of the Note. (*Id.* at 2–3.)

28. Greater Nevada transferred the PIA PPP Loan to loan servicer Fountainhead Commercial Capital LLC ("Fountainhead"). (Andrews Decl. ¶ 20.)

29. PIA only began hiring "when the PPP loan was funded." (Lofton Tr. 80:17–19.)

30. Lofton "intended to use the $1.2 million loan, the PPP loan to increase [her] business." (Lofton Tr. 85:12–14.)

31. Defendants applied for forgiveness of the PIA PPP Loan on July 14, 2021. (PIA Forgiveness Application at 2 (attached as Exh. 10).)

32. SBA required forgiveness applicants to spend at least 60% of the forgiveness amount requested on payroll costs. (*Id.*; Paycheck Protection Program—Revisions to First Interim Final Rule, 85 Fed. Reg. 36308, 36310 (June 16, 2020).)

33. Lofton certified that PIA spent at least 60% of the forgiveness amount requested ($1,199,999) on payroll costs. (PIA Forgiveness Application at 2.)

34. Lofton certified that PIA "accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness." (*Id.*)

35. Lofton stated in the forgiveness application that PIA spent $764,341 on payroll costs, including $720,000 of cash compensation to employees, between May 21 and November 4, 2020, and that PIA was eligible for full forgiveness of the PIA PPP Loan. (*Id.* at 1–3.)

36. Lofton hired a "bookkeeper," Jenifer Parker, to prepare the forgiveness application. (Lofton Tr. 87:17-90:11.)

37. Lofton claimed she "did not have any role in calculating that $720,000 number" represented to SBA for cash compensation to employees. (Lofton Tr. 90:12-18.)

38. Parker filled out the PIA PPP Loan forgiveness application using PIA records and sent it to Lofton to review and sign. (Lofton Tr. 106:2–24; Transcript of Deposition of Jenifer Parker ("Parker Tr.") 27:2–14 (excerpts attached as Exh. 11).)

39. Parker "explained to [Lofton] at one point in time that I wasn't sure she should apply for forgiveness" because "I knew she didn't meet the qualifications" for payroll expenses. (Parker Tr. 60:10–61:9.)

40. Lofton engaged in an email "back and forth" with Parker and instructed her to change aspects of the forgiveness application. (Parker Tr. 60:10–61:3.)

41. On July 9, 2021, a Fountainhead representative informed Lofton that if PIA were to submit a forgiveness application with $157,431 of eligible payroll expenses, forgiveness

would be partially denied because of the 60% rule.  (Fountainhead Correspondence at 7–8 (attached as Exh. 12).)

42. PIA "did not have 60 percent of payroll" and "may not have complied with [the 60% rule] because I couldn't.  There was nothing for employees to do."  (Lofton Tr. 187:21–24.)

43. Lofton reviewed the loan forgiveness application form and signed it, stating she "just said 100 percent of the funds were used for salaries, utilities, [and] interests."  (Lofton Tr. 87:22–24, 106:17–19, 132:15–20.)

44. In 2020, "Passive Income Advisors spent only around $140,000 on payroll" and reported $142,226.57 in payroll to the IRS.  (Lofton Tr. 98:8–99:4, 135:3–5.)

45. PIA and Lofton spent PPP funds on rent payments to other entities owned by Lofton and football ticket licenses for resale.  (Lofton Tr. 26:7–14, 81:11–17, 136:23–139:17.)

46. If SBA determined that a borrower was ineligible to receive a PPP loan, SBA denied forgiveness.  (Andrews Decl. ¶ 17.)

47. If SBA determined that a borrower's PPP loan exceeded its average monthly payroll at the time of its application multiplied by 2.5, SBA denied forgiveness for the excess loan amount.  (*Id.* ¶ 18.)

48. On July 23, 2021, SBA informed PIA and Lofton through Fountainhead that it needed additional documentation of payroll before and after the PIA PPP Loan was received to make a forgiveness decision.  (July 23, 2021 Notice (attached as Exh. 13).)

49. SBA initially denied PIA's application for forgiveness on February 2, 2022, finding that PIA was ineligible because it "did not have any eligible payroll cost at the time of loan application," because PIA failed "to respond to SBA's inquiry for request of additional required information," and because PIA's 2019 Schedule C (Form 1040)

submitted with Lofton's 2019 tax return "demonstrates a negative net income,
indicating the Borrower may have not been eligible to receive a PPP loan." (Initial
Forgiveness Denial (attached as Exh. 14).)

50. SBA issued its final denial of forgiveness on May 10, 2022, removing failure to respond
as a reason for denial but otherwise finding that PIA was ineligible for the same reasons.
(Final Forgiveness Denial (attached as Exh. 15).)

51. Lofton received each notice. (Lofton Tr. 112:7–17, 127:22–128:17, 141:18–142:11.)

52. PIA and Lofton knew of their obligation to repay the PPP loan funds to their lender.
(Lofton Tr. 129:12-15.)

53. PIA and Lofton have refused to repay the PIA PPP Loan. (RFA Responses at 6.)

54. SBA purchased the PIA PPP Loan from Fountainhead as required by its guaranty and
transferred the loan to the Department of the Treasury ("Treasury") on or around March
9, 2022. (Andrews Decl. ¶¶ 22–23.)

55. For a loan of $1,199,999, SBA paid the lender $35,999.97 in origination fees. (*Id.* ¶ 7.)

56. On March 22, 2023, Treasury informed Defendants that they owed the United States the
debt from the PIA PPP Loan. (Treasury Notice and Response (attached as Exh. 16).)

57. PIA and Lofton were made aware of their obligation to repay the PPP loan funds to the
United States government. (Lofton Tr. 158:10-159:13.)

58. PIA and Lofton refused to repay the obligation to repay the PPP loan funds to the
United States government. (Lofton Tr. 159:14-16; 161:5-8.)

59. On April 7, 2023, PIA and Lofton responded to the Treasury correspondence with a
demand that the United States cease contacting her and pay out $3,000,000 in additional
funds to Defendants. (Treasury Notice and Response at 2; Lofton Tr. 159:17-161:4.)

**LEGAL STANDARD**

Summary judgment is proper when the pleadings, the discovery and disclosure materials, and any affidavits or declarations show that there is no genuine dispute of any material fact and that the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 323–25 (1986). "There is a genuine issue of material fact when a reasonable jury reviewing the evidence submitted on summary judgment could return a verdict for the nonmoving party." *Hawai'i Disability Rights Ctr. v. Kishimoto*, 122 F.4th 353, 363 (9th Cir. 2024). The moving party has "the ultimate burden of persuasion on a motion for summary judgment." *Friedman v. Live Nation Merch., Inc.*, 833 F.3d 1180, 1188 (9th Cir. 2016) (quoting *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1102 (9th Cir. 2000)). In considering a motion for summary judgment, a court must view the evidence "in the light most favorable to the opposing party." *Tolan v. Cotton*, 572 U.S. 650, 657 (2014) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970)).

**BACKGROUND**

**I. Statutory and Legal Framework**

**A. The Paycheck Protection Program**

In March 2020, Congress passed the CARES Act, Pub. L. No. 116-136, 134 Stat. 281 (2020), to provide emergency assistance to individuals, families, businesses, and health-care providers coping with the coronavirus pandemic. *See* 85 Fed. Reg. at 20811–12 (discussing the purpose of the CARES Act). One of the Act's measures was the PPP, CARES Act § 1102, tasking SBA with implementing a loan program to provide emergency financial assistance to small businesses experiencing economic hardship due to the pandemic. *Id.*

Section 1102(a)(2) of the CARES Act temporarily expanded SBA's business-loan authority by adding a new paragraph to SBA's longstanding general purpose loan

framework, § 7(a).  15 U.S.C. § 636(a)(36); *see In re Gateway Radiology Consultants, P.A.*, 983 F.3d 1239, 1249 (11th Cir. 2020) ("[T]he PPP was not created as a standalone program; instead it was added into § 7(a)[.]").  Section 636(a)(36)(B) states that "[e]xcept as otherwise provided in [Section 636(a)(36)], the [SBA] may guarantee [PPP] loans," issued by private lenders, "under the same terms, conditions, and processes as [other] loan[s] made under" § 7(a).  The statute then detailed the ways in which PPP loans would differ from other § 7(a) loans.  15 U.S.C. § 636(a)(36)(D)–(W).  The CARES Act finally provided for forgiveness of up to the full principal amount of SBA guaranteed loans under the PPP.  CARES Act, Pub. L. No. 116-136, § 1106, 134 Stat. 281 (2020).

Congress initially authorized SBA to guarantee up to $349 billion in PPP loans by June 30, 2020. CARES Act, Pub. L. No. 116-136, § 1102(b)(1), 134 Stat. 281 (2020).  To ensure that SBA could make such an enormous sum available to small businesses in such a short timeframe, Congress instructed SBA to issue rules implementing the PPP "[n]ot later than 15 days after" the CARES Act's enactment, 15 U.S.C. § 9012, described as "warp speed for regulatory action," *In re Gateway Radiology Consultants*, 983 F.3d at 1262.  To make that feat possible, Congress instructed SBA to issue these rules without regard to APA notice-and-comment procedures. 15 U.S.C. § 9012 (citing 5 U.S.C. § 553(b)).  Congress also directed that SBA allow additional non-§ 7(a) lenders to participate in the PPP and mandated that SBA give all PPP lenders "delegated authority" to make and approve PPP loans without prior SBA review.  15 U.S.C. § 636(a)(36)(F)(ii)(I), (iii).

SBA launched the PPP on April 3, 2020.  SBA Press Release No. 20-30, SMALL BUS. ADMIN. (Apr. 3, 2020), https://www.sba.gov/article/2020/apr/03/sbas-paycheck-protection-program-small-businesses-affected-coronavirus-pandemic-launches (last visited August 7, 2025).  In light of Congress's clear intent and the needs of small businesses for immediate assistance, SBA also established a highly streamlined PPP loan-origination

process based on borrower self-certifications of eligibility.  *See* 85 Fed. Reg. at 20812, 20814–16.  Because borrowers' applications and supporting documentation were maintained by lenders, not sent to the SBA, *see id.* at 20814, the SBA did not (and as a practical matter could not) make independent determinations regarding borrower eligibility or compliance with program rules at the loan-origination stage.

The CARES Act required lenders to "consider whether the borrower" was in operation on February 15, 2020, and had employees or paid independent contractors as reported to the IRS.  15 U.S.C. § 636(a)(36)(F)(ii)(II).  An Interim Final Rule issued by SBA on April 15, 2020, made clear that this was an express condition of eligibility.  85 Fed. Reg. at 20812.  Congress provided that the PPP's "maximum loan amount" was a borrower's average monthly payroll expenses to employees for the 1-year period before the date of the loan multiplied by 2.5, with some exceptions not applicable here.  15 U.S.C. § 636(a)(36)(E).

**B. SBA's Section 7(a) Loan Program**

Section 7(a) of the Small Business Act "empower[s]" SBA to guarantee general purpose loans to small businesses.  15 U.S.C. § 636(a).  Typically, SBA guarantees loans by private lenders rather than disbursing funds directly.  *In re Gateway Radiology Consultants*, 983 F.3d at 1248.  Under § 7(a) loan regulations, SBA guaranteed loans are funded and serviced by lenders, but if a borrower defaults, "SBA's guarantee requires SBA to purchase its portion of the outstanding balance."  13 C.F.R. § 120.2(a)(iii).  The Small Business Act also broadly authorizes SBA to "make such rules and regulations" as the agency "deems necessary" to implement the loan program, and to "take any and all actions" the agency "determines . . . are necessary or desirable in making, servicing, compromising, modifying, liquidating, or otherwise dealing with or realizing on loans[.]"  15 U.S.C. § 634(b)(6–7).

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

### C.    PPP Loan Forgiveness

The CARES Act provided that "[a]n eligible recipient [of a PPP loan] shall be eligible for forgiveness . . . in an amount equal to the sum of" its covered payroll costs and other allowable expenses, 15 U.S.C. § 636m(b), not to exceed the principal amount of the loan.  15 U.S.C. § 636m(d)(1).  Absent certain exceptions not relevant to this case, to obtain forgiveness, an eligible borrower was required to submit an application and supporting documentation to its lender, which would determine if the borrower would be entitled to forgiveness under the Act, and, if so, submit a request for payment to SBA.  15 U.S.C. § 636m(g); Paycheck Protection Program—Loan Forgiveness Requirements and Loan Review Procedures as Amended by Economic Aid Act, 86 Fed. Reg. 8283, 8287–88 (Feb. 5, 2021).  SBA would then remit the appropriate amount to the lender—subject to any SBA review of the loan.  15 U.S.C. § 636m(c)(3); 86 Fed. Reg. at 8288.

The simplified PPP loan application process, combined with the large number of first-time SBA borrowers and lenders who lacked familiarity with SBA rules and regulations, created a heightened risk of erroneous loan applications and approvals.  To maintain the PPP's fiscal integrity and "ensure that PPP loans are directed to the entities Congress intended, and that PPP loan proceeds are used for the purposes Congress required, including the CARES Act's central purpose of keeping workers paid and employed," SBA implemented a system of PPP loan review.  Paycheck Protection Program—SBA Loan Review Procedures and Related Borrower and Lender Responsibilities, 85 Fed. Reg. 33010, 33012 (June 1, 2020).  If SBA determines during review that "a borrower is ineligible for the PPP loan," or "is ineligible for the loan amount or loan forgiveness amount claimed," it will deny the application for loan forgiveness in whole or in part.  *Id.*

If a PPP loan is not forgiven and the loan payment becomes more than 60 days past due, SBA instructs lenders to "request a guaranty purchase, which is SBA's purchase of the

guaranteed portion of the loan." U.S. SMALL BUS. ADMIN., OFF. OF INSPECTOR GEN.,

SBA'S GUARANTY PURCHASES FOR PAYCHECK PROTECTION PROGRAM LOANS 3 (July 9,

2024) https://www.sba.gov/sites/default/files/2024-07/SBA%20OIG%20Report%2024-

20.pdf (last visited August 7, 2025). SBA then "simultaneously purchases and charges off

delinquent loans," and "[c]harge-off status means SBA removes the outstanding balance of

the loan from its accounting records." *Id.* Charged-off loans are then referred to the

Department of the Treasury for debt collection. *Id.* at 9.

## II.    PIA's PPP Loan Application and Procedural History

Defendants applied for a $1,200,000 PPP loan (the "PIA PPP Loan") on May 11,

2020, through lender Greater Nevada. (SUF ¶¶ 7–8.) Lofton signed the application and

certified that PIA had $1,000,000 in average monthly payroll expenses. (SUF ¶¶ 8, 12.)

Greater Nevada approved the PIA PPP Loan and disbursed $1,199,999.00. (SUF ¶ 25.)

Lofton applied for forgiveness of the PIA PPP Loan on July 14, 2021. (SUF

¶¶ 31, 43.) SBA issued an initial denial of forgiveness on February 2, 2022, finding that

PIA was ineligible because it "did not have any eligible payroll cost at the time of loan

application," because PIA failed "to respond to SBA's inquiry for request of additional

required information," and because PIA's 2019 Schedule C form filed with Lofton's 2019

tax return "demonstrates a negative net income, indicating the Borrower may have not

been eligible to receive a PPP loan." (SUF ¶ 49.) SBA issued a final denial decision on

May 10, 2022, that removed failure to respond as a justification for denial. (SUF ¶ 50.)

Lofton and PIA refused to pay the balance on the loan. (SUF ¶ 53.) SBA purchased the

debt and charged it off to Treasury, which issued a notice of amounts owed on March 22,

2023, informing PIA that it owed the PPP loan funds to the United States. (SUF ¶¶ 54,

56.)  Lofton replied to the Treasury notice, refusing to pay and demanding additional PPP

funds in order to finance her response to Treasury.  (SUF ¶ 59.)

Relator Bryan Quesenberry filed the original *qui tam* complaint in this action on

behalf of the United States, the real party in interest.  (ECF No. 36 ¶ 5).  Relator alleged

that PIA had fraudulently received a PPP loan, alongside other unrelated defendants.  The

complaint was sealed under 31 U.S.C. § 3730, and the United States investigated the

allegations.  The United States intervened against PIA and additionally brought claims

against Lofton.  The remaining defendants were voluntarily dismissed by Relator on

July 26, 2024.  (ECF No. 32.)  The United States filed its Complaint in Intervention on

October 3, 2024.  (ECF No. 36.)  Defendants filed a motion to dismiss and motion for

summary judgment on January 9, 2025.  (ECF No. 45.)  The United States responded

(ECF No. 48) and Defendants replied, (ECF No. 49); the motions remain pending.

## **ARGUMENT**

The United States moves for summary judgment on all claims.  There is no genuine

dispute of material fact that Defendants are liable to the United States under each count.

**I.   The Undisputed Evidence Establishes Defendants' Liability under Counts I and II.**

The United States is entitled to summary judgment for its claims under 31 U.S.C.

§ 3729(a)(1)(A) and 3729(a)(1)(B).  The FCA imposes liability on any person who

"knowingly presents, or causes to be presented, a false or fraudulent claim for payment or

approval" and who "knowingly makes, uses, or causes to be made or used, a false record or

statement material to a false or fraudulent claim."  31 U.S.C. § 3729(a)(1)(A–B).

In the Ninth Circuit, a successful False Claims Act claim requires "(1) a false

statement or fraudulent course of conduct, (2) made with the scienter, (3) that was material,

causing (4) the government to pay out money or forfeit moneys due."  *U.S. ex rel. Campie v.*

*Gilead Scis., Inc.*, 862 F.3d 890, 899 (9th Cir. 2017) (citation omitted).  Section 3729(a)(1)(B) is "complementary" to § 3729(a)(1)(A), and the elements for each count "are practically identical."  *U.S. v. Honolulu Comm. Action Prog., Inc.*, No. 16-00062 JMS-KJM, 2019 WL 4739283, at *7 (D. Haw. Sept. 27, 2019) (quoting *Pencheng Si v. Laogai Rsrch. Found.*, 71 F. Supp. 3d 73, 87 (D.D.C. 2014) (Jackson, J.)).  Section 3729(a)(1)(B) prevents "those who make false records or statements . . . from escaping liability solely on the ground that they did not *themselves* present a claim for payment or approval."  *Id.* (quoting *U.S. ex rel. Totten v. Bombardier Corp.*, 380 F.3d 488, 501 (D.C. Cir. 2004) (Roberts, J.)) (alteration in original).  The FCA is interpreted "broadly, in keeping with the Congress' intention 'to reach all types of fraud, without qualification, that might result in financial loss to the Government.'" *U.S. ex rel. Winter v. Gardens Reg. Hosp. & Med. Ctr., Inc.*, 953 F.3d 1108, 1116 (9th Cir. 2020) (quoting *United States v. Neifert-White Co.*, 390 U.S. 228, 232 (1968)).

### A. The PIA PPP Loan Application Included False Statements.

Because "Congress did not define what makes a claim 'false' or 'fraudulent'" in the FCA, courts apply the "well-settled meaning of the common-law terms," which includes "claims containing express falsehoods."  *Univ. Health Servs. v. U.S. ex rel. Escobar*, 579 U.S. 176, 187 (2016) (citation omitted).  Lofton expressly certified in the PIA PPP Loan application that, as of February 15, 2020, PIA "had employees for whom it paid salaries and payroll taxes or paid independent contractors, as reported on Form(s) 1099-MISC." (SUF ¶ 9.)  Lofton stated that PIA had 5 employees and an average monthly payroll of $1,000,000.  (SUF ¶¶ 10, 12.)  These statements were false.  PIA had no employees, no payroll, and no independent contractors reported to the IRS.  (SUF ¶¶ 11, 14, 16.)

Defendants admit that at the time of the loan application, PIA did not have employees and instead claim that PIA had "contractors."  (SUF ¶ 15.)  Lofton further conceded that PIA only began hiring employees "when the PPP loan was funded."  (SUF

¶ 29.)  Although Lofton testified that PIA only had contractors in 2019, Defendants reported no payments to the IRS "that would require [PIA] to file Form(s) 1099" in either 2019 or 2020.  (SUF ¶ 16.)  No Forms 1099 for either year were produced by Defendants.  Lofton cannot show a genuine issue of fact that PIA had employees or contractors.

Lofton also stated on the loan application that PIA's average monthly payroll was $1,000,000 and requested a loan of $1,200,000.  (SUF ¶¶ 7, 12.)  Defendants assert that this was a "typo that should have stated $480,000," which is the minimum payroll necessary for a $1,200,000 PPP loan.  (SUF ¶¶ 3, 13.)  But Lofton admitted in her deposition that PIA did not have even $480,000 in monthly payroll at the time of the loan application, and, as noted above, the company had no monthly payroll expenses at all.  (SUF ¶ 14.)[1]  There is no dispute that Lofton's statement that PIA had $1,000,000 in monthly payroll was factually false.

### B.  Lofton Had Knowledge of the PIA PPP Loan Application's Falsity

The FCA imposes liability on any person who submits a false claim to the government with "actual knowledge," "deliberate ignorance," or "reckless disregard of the truth."  31 U.S.C. § 3729(a)(1)(A)-(B), (b)(1)(A)(i)-(iii*); see also U.S. ex rel. Longhi v. Lithium Power Techs., Inc.*, 513 F. Supp. 2d 866, 875–76 (S.D. Tex. 2007) (describing the three types of scienter as (1) actual knowledge; (2) "constructive knowledge;" and (3) "gross negligence plus").  "[N]o proof of specific intent to defraud" is "require[d]." 31 U.S.C. § 3729(b)(1)(B).

---

[1] Even if PIA made payments to contractors at the time of the loan application (a statement not supported by evidence), Defendants are still liable because "Congress's design for the PPP was clear: 'Payroll costs' do not include payments that small businesses made to independent contractors."  *Seville Indus., L.L.C. v. U.S. Small Bus. Admin.*, --- F.4th ---, 2025 WL 1937190,at *9 (5th Cir. July 15, 2025); 85 Fed. Reg. at 20813; *see Veltor Underground, LLC v. U.S. Small Bus. Admin.*, --- F.4th ---, 2025 WL 1911817, at *2 (6th Cir. July 11, 2025) (holding that "payroll costs" "does not allow other businesses to bolster their own loans based on how much they happen to pay self-employed individuals").

In defining "knowingly" to include deliberate ignorance and reckless disregard, "Congress attempted 'to reach what has become known as the "ostrich" type situation where an individual has "buried his head in the sand" and failed to make simple inquiries which would alert him that false claims are being submitted.'" *United States v. Bourseau*, 531 F.3d 1159, 1168 (9th Cir. 2008) (quoting S. Rep. No. 99–345, at 21 (1986)); *see U.S. ex rel. Phalp v. Lincare Holdings, Inc.*, 857 F.3d 1148, 1155 (11th Cir. 2017) (discussing the same as applied to reckless disregard).  Congress further "adopted 'the concept that individuals and contractors receiving public funds have some duty to make a limited inquiry so as to be reasonably certain they are entitled to the money they seek.'" *Bourseau*, 531 F.3d at 1168 (quoting S. Rep. No. 99-345, at 20 (1986)).  Circuit courts have "uniformly described *reckless disregard* for purposes of the False Claims Act as akin to 'an extension of gross negligence' or an 'extreme version of ordinary negligence.'"  *Urquilla-Diaz v. Kaplan Univ.*, 780 F.3d 1039, 1058 (11th Cir. 2015) (quoting *United States v. Krizek*, 111 F.3d 934, 942 (D.C. Cir. 1997); *U.S. ex rel. Farmer v. City of Houston*, 523 F.3d 333, 338 & n.9 (5th Cir. 2008)).

There is no genuine dispute that Lofton acted with, at minimum, reckless disregard or deliberate ignorance of the falsity of her statements when she certified that, as of February 15, 2020, PIA had employees or paid independent contractors as reported to the IRS and had enough payroll to be eligible for a $1,200,000 loan.  It is undisputed that Lofton was aware that PIA had no employees, had no contractors reported to the IRS, and had no payroll before she submitted the PIA PPP Loan application and that, as a result, her statements on the application were false.  (SUF ¶¶ 11, 14, 16.)  Lofton claims that she used "projections for the actual number of employees that I was planning to hire" in order to calculate the requested loan value.  (SUF ¶ 19.)  Lofton claims that she "subjectively believed" such projections were permissible based on various non-PPP specific regulations and unspecified communications with SBA officials.  (SUF ¶ 19.)  But Lofton admitted that

she read the instructions included in the PPP application and that nowhere in those instructions is any reference to "future costs." (SUF ¶ 20.) There is no dispute that under the plain, unambiguous language of the CARES Act, SBA regulations, and the loan application that all PPP loan funds were intended for businesses operating with employees prior to the pandemic. 85 Fed. Reg. at 20812. There is also no doubt that businesses were only entitled to receive funds up to a multiple of their average payroll costs incurred *prior to* the PPP application date. 15 U.S.C. § 636(a)(36)(E).

At her deposition, Lofton pointed to a general 7(a) loan requirement issued April 1, 2019, that a business can use *revenue* projections to determine if it is one of the *categories* of businesses eligible for a 7(a) loan. (SUF ¶¶ 21–22.) Lofton admitted that the provision she cited had no reference to a business's qualification for a certain loan amount. (SUF ¶ 23.) Most importantly, this guidance was not included in any PPP instructions, and Lofton failed to recall any guidance related to the use of projections to determine a business's PPP loan amount. (SUF ¶¶ 20, 24.) Lofton's only evidence for her contemporaneous belief that projections were permissible is a self-serving declaration, (SUF ¶ 19), and it is well established that a "conclusory, self-serving affidavit, lacking detailed facts and any supporting evidence, is insufficient to create a genuine issue of material fact." *Nilsson v. City of Mesa*, 503 F.3d 947, 952 n.2 (9th Cir. 2007) (quoting *Fed. Trade Comm'n v. Publ'g Clearing House, Inc.*, 104 F.3d 1168, 1171 (9th Cir. 1997)) (a plaintiff's affidavit that she did not understand a liability waiver was insufficient to create a genuine issue of material fact).

The PPP's requirements that a borrower, as of February 15, 2020, have employees or independent contractors reported to the IRS, and have actual payroll expenses were clear, unambiguous, and listed directly on the PPP application. There was no mention of projections related to any of these requirements. Lofton read the application, made false statements in the application that PIA had 5 employees and $1,000,000 of monthly payroll

expenses, certified that this information was correct, and then submitted it. (SUF ¶¶ 9–14, 18, 20). Lofton acted with at least reckless disregard of the falsity of the PIA PPP Loan application because she acted in total disregard of the application's instructions.

**C. The PIA PPP Loan Application was Materially False.**

A statement is "material" under the FCA if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). The materiality standard is "demanding," but there is no "bright-line test for determining whether the FCA's materiality requirement has been met." *U.S. ex rel. Godecke v. Kinetic Concepts, Inc.*, 937 F.3d 1201, 1213 (9th Cir. 2019) (citing *Escobar*, 579 U.S. at 194 ). Materiality "looks to the effect on the likely or actual behavior of the recipient of the alleged misrepresentation." *Escobar*, 579 U.S. at 193 (citation omitted). The Supreme Court identified at least four factors relevant to materiality in *Escobar*: (1) whether the violated requirement is a condition of payment; (2) whether the violations go to the "essence of the bargain"; (3) whether the violations are significant or trivial; and (4) what actions the government has taken when it has actual knowledge of the same or similar violations. *Id.* at 193–95 & n.5; *U.S. ex rel. Mei Ling v. Los Angeles*, 389 F. Supp. 3d 744, 753 (C.D. Cal. 2019).

Lofton's statements were material to Greater Nevada and SBA's decision to issue a $1,199,999.00 loan to PIA because they had a natural tendency to influence both PIA's eligibility and the amount of the loan. As indicated on the PPP loan application, borrowers were required to certify that, as of February 15, 2020, they paid employees or independent contractors reported on a 1099-MISC. (SUF ¶¶ 2, 9.) SBA communicated at all times that this was a condition of eligibility. *E.g.*, 85 Fed. Reg. at 20812. An applicant would not have been able to receive a PPP loan if it failed to meet this requirement. (SUF ¶ 2). Lofton's certification and statement that PIA had 5 employees at the application were therefore

material because they addressed an express condition of loan eligibility and, had Lofton been truthful, PIA would not have received a loan.

Similarly, Lofton's statement that PIA had an average monthly payroll of $1,000,000 was also material because it was necessary to determine the amount of the loan. The statutory "maximum loan amount" was a business's average monthly payroll for the 1-year period before the date of the loan multiplied by 2.5, subject to certain exceptions not applicable here. 15 U.S.C. § 636(a)(36)(E). Lofton requested a $1,200,000 loan for PIA, (SUF ¶ 7), so without a false statement of at least $480,000 in payroll, PIA would never have received its PPP loan. (SUF ¶¶ 3, 47.) Indeed, SBA ultimately denied forgiveness of the loan because it determined that PIA was ineligible because it "did not have any eligible payroll cost at the time of loan application." (SUF ¶¶ 49–50.)

### D. The Materially False Loan Application Caused SBA to Pay Federal Funds.

The fourth element is the titular "claim" of the FCA. *See Campie*, 862 F.3d at 907 (referring to the fourth element as the "claim"); *U.S. ex rel. Hendow v. Univ. of Phx.*, 461 F.3d 1166, 1177 (9th Cir. 2006) (same). A "claim" under the FCA means "any request or demand, whether under a contract or otherwise, for money or property," regardless of whether the United States has title to the money or property that "is presented to an officer, employee, or agent of the United States" or "is made to a contractor, grantee, or other recipient, if the money is to be spent or used on the Government's behalf or to advance a Government program or interest" and the United States has or will provide or reimburse any portion of the money or property. 31 U.S.C. § 3729(b)(2). Presentment of a claim against the government fisc can take multiple forms, including direct requests for payment to a federal agency and "submitting requests to private lenders for government-insured loans." *Hendow*, 461 F.3d at 1177 (holding relators properly alleged such claims). It is "irrelevant how the federal bureaucracy has apportioned the [false] statements among layers of

paperwork," and "[a]ll that matters is whether the false statement or course of conduct causes the government to 'pay out money or to forfeit moneys due.'" *Id.* (citations omitted).

A PPP application submitted to a lender acting with delegated authority from SBA to issue PPP loans is a request for a government-insured loan and therefore a "claim" under the FCA.  First, a PPP application is a request for money from a lender.  Second, the CARES Act "temporarily permit[ted] SBA to guarantee 100 percent of 7(a) loans."  85 Fed. Reg. at 20811.  Thus, lenders could issue PPP loans at no risk because SBA would either forgive or purchase any outstanding amounts.  Because lenders issued PPP loans on SBA's behalf and to support its interest in alleviating the impacts of COVID-19 and because SBA was responsible for 100% of all loan amounts, a PPP application is a "claim."

There is no dispute that Lofton submitted the PIA PPP Loan application to Greater Nevada.  (SUF ¶¶ 7–9, 19–20.)  SBA authorized Greater Nevada to issue PPP loans to borrowers.  (SUF ¶ 4.)  Under the CARES Act, authorized lenders "shall be deemed to have been delegated authority by the Administrator [of the SBA] to make and approve covered loans."  15 U.S.C. § 636(a)(36)(F)(ii)(I).  SBA only required Greater Nevada to submit an "executed SBA Form 2484," an official request for a loan guaranty, "to issue PPP loans and receive a loan number for each originated PPP loan" through SBA's E-Tran system without waiting for a "separate SBA Authorization."  Paycheck Protection Program— Requirements—Promissory Notes, Authorizations, Affiliation, and Eligibility, 85 Fed. Reg. 23450, 23451 & n.1 (Apr. 28, 2020).  Congress and the SBA Administrator directly delegated authority to Greater Nevada to make and approve the PIA PPP Loan, which was fully guaranteed by SBA.  Accordingly, Lofton's materially false claims caused the government to pay out money through her submission of the loan application to Greater Nevada and by causing Greater Nevada to submit a materially false request for a loan

guaranty to SBA.  After Lofton refused to pay the loan, SBA was required to purchase the full loan amount.  (SUF ¶¶ 53–54.)

Because the PIA PPP Loan application was a request for money pursuant to a government-insured loan program and because the application included materially false statements made with, at minimum, reckless disregard of their falsity, the United States is entitled to summary judgment as to its claims under 31 U.S.C. § 3729(a)(1)(A) and (B).

**II.  The Undisputed Evidence Establishes Defendants' Liability under Count III for Reverse False Claim.**

The "reverse false claim" provision of the FCA imposes liability on a defendant who (1) "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, *or* (2) knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729(a)(1)(G) (emphasis added).  Defendants are liable under both prongs.  This provision "is designed to cover Government money or property that is knowingly retained by a person even though they have no right to it."  *U.S. ex rel. Silingo v. WellPoint, Inc.*, 904 F.3d 667, 676 (9th Cir. 2018) (quoting S. Rep. No. 111-10 at 13–14 (2009)).

**A.  Defendants are Liable under the First Prong Because They Made a False Statement Material to an Obligation to Pay the United States.**

Summary judgment is proper under the first theory of liability for a reverse false claim.  The FCA imposes liability on anyone who "knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government."  31 U.S.C. § 3729 (a)(1)(G).  Accordingly, the first theory of the reverse false claim provision requires a showing of (1) falsity; (2) knowledge; (3) use; (4) materiality; and (5) an obligation.

Lofton violated the reverse false claim provision when she knowingly submitted PIA's application for forgiveness for the PIA PPP Loan, which included false payroll information that was material to SBA's forgiveness decision.

### (1) Falsity

"In an archetypal *qui tam* False Claims action, such as where a private company overcharges under a government contract, the claim for payment is itself literally false or fraudulent." *Hendow*, 461 F.3d at 1170.  A factually false claim alleges "an explicit lie in a claim for payment, such as an overstatement of the amount due." *Haw. ex rel. Torricer v. Lib. Dialysis-Haw. LLC*, 512 F. Supp. 3d 1096, 1108 (D. Haw. 2021) (citation omitted).

The PIA PPP forgiveness application included a factually false statement.  Lofton stated that PIA had $764,341 in eligible payroll costs, including $720,000 in cash compensation to employees, between May 21, 2020, and November 4, 2020, and Lofton certified that she "accurately verified the payments for the eligible payroll and nonpayroll costs for which the Borrower is requesting forgiveness."  (SUF ¶¶ 34–35.)  These statements were false.  PIA reported $142,226.57 in payroll for 2020 to the IRS, and Lofton confirmed that in 2020 "Passive Income Advisors spent only around $140,000 on payroll."  (SUF ¶ 44.)  This was an "overstatement of the amount due" to be forgiven because the amount of any PPP loan eligible to be forgiven depended directly on a business's payroll costs. *Torricer*, 512 F. Supp 3d at 1108.  PIA's PPP forgiveness application was factually false.

### (2) Knowledge

As discussed above, "knowledge" includes (1) actual knowledge; (2) deliberate ignorance of truth or falsity; and (3) reckless disregard of truth or falsity.  31 U.S.C. § 3729(b)(1).  No "proof of specific intent to defraud" is required.  31 U.S.C. § 3729(b)(1)(B). "Deliberate ignorance" captures "the 'ostrich' type situation where an individual has 'buried his head in the sand' and failed to make simple inquiries which would alert him that false

claims are being submitted." *Bourseau*, 531 F.3d at 1168 (quoting S. Rep. No. 99–345, at 21 (1986)); *see Island Indus., Inc. v. Sigma Corp.*, 142 F.4th 1153, 1168 (9th Cir. June 23, 2025) (holding that there was sufficient evidence for a jury to find deliberate ignorance or reckless disregard based on a failure to inquire). Those receiving federal funds have "some duty to make a limited inquiry so as to be reasonably certain they are entitled" to those funds. *Bourseau*, 531 F.3d at 1168 (quoting S. Rep. No. 99-345, at 20 (1986)).

Although Lofton signed the forgiveness application, she testified that she did not prepare the application, and that it was prepared by her bookkeeper, Jenifer Parker.[2] (SUF ¶¶ 36, 43.) But Parker's testimony revealed that Lofton either knew the payroll number was false or failed to conduct any inquiry into its accuracy. Parker filled out the PIA PPP forgiveness application and sent it to Lofton to review and sign. (SUF ¶ 38.) Parker and Lofton communicated "back and forth" on the application, with Parker "explain[ing] to [Lofton] at one point in time that I wasn't sure she should apply for forgiveness" because "I knew she didn't meet the qualifications" for payroll expenses. (SUF ¶¶ 39–40.)

Part of the "back and forth" included an email thread between Lofton, Parker, and a Fountainhead representative. (SUF ¶ 41.) Before Lofton submitted the PIA PPP forgiveness application, Fountainhead informed her that if PIA submitted an application with only $157,431 of payroll expenses, similar to what PIA actually spent on payroll in 2020, forgiveness would be partially denied because of the 60% rule. (SUF ¶ 41.) Five days later, Lofton submitted the forgiveness application to Fountainhead, falsely stating that PIA spent $720,000 on payments to employees, which is 60% of the PIA PPP Loan amount rounded to one-ten-thousandth of a percent. (SUF ¶ 31, 35.) Lofton acknowledged in her

---

[2] Lofton's self-serving testimony—contradicted by Parker's testimony—includes disclaiming "any role in calculating that $720,000" in cash compensation submitted to SBA. (SUF ¶ 37.)

deposition: "I did not have 60 percent of payroll . . . I may have not complied with that because I couldn't. There was nothing for employees to do." (SUF ¶ 42.)

Lofton was informed by both an accountant (Jennifer Parker) and the lender (Fountainhead) that PIA's actual payroll could not justify full forgiveness. (SUF ¶¶ 39, 41.) But Lofton nevertheless submitted the forgiveness application with false payroll figures. (SUF ¶¶ 35, 42–44.) Further, Lofton admitted that she failed to make any inquiry at all into the accuracy of PIA's payroll costs, let alone a reasonable one. (SUF ¶ 37.) Lofton acted with knowledge, or at the very least deliberate ignorance, as to the falsity of the $720,000 listed on the application.

### (3) Use

Lofton made, used, or caused to be made or used the forgiveness application. Lofton hired Jenifer Parker to prepare the PIA PPP forgiveness application, authorized her to use PIA's payroll records to prepare it, required Parker to send it to Lofton for signing, and either submitted it to Fountainhead and SBA personally or through Parker. (SUF ¶¶ 36, 38, 43.) Parker completed the application with PIA records and Lofton instructed Parker to change specific aspects of the application. (SUF ¶¶ 38, 40.) At all stages of the process, Lofton controlled PIA's forgiveness application. She retained Parker to complete the application, provided the necessary information, instructed Parker on specific changes, disregarded Parker's warning about ineligibility, signed the application for submission, and certified that she had verified the payments for the eligible payroll. (SUF ¶¶ 34, 36–40, 43.)

### (4) Materiality

As discussed above, a statement is material under the FCA if it has "a natural tendency to influence, or be capable of influencing, the payment or receipt of money or property." 31 U.S.C. § 3729(b)(4). All four of the non-exhaustive factors identified in *Escobar* weigh in favor of a finding of materiality. In order to receive full forgiveness of a

PPP loan, a borrower was expressly required to spend at least 60% of the loan on payroll costs. (SUF ¶ 32.) This requirement was core to the "essence of the bargain" of the PPP because it governed how borrowers could use the lion's share of their loans and effected the CARES Act's "overarching focus on keeping workers paid and employed." 85 Fed. Reg. at 20814. In other words, this requirement protected Americans' paychecks. Lofton's false statement was a significant deviation from the program's requirements: she claimed PIA spent approximately five times as much on payroll as it actually did. When SBA has actual knowledge of an inflated payroll number on a forgiveness application, it reduces the forgiven amount. (SUF ¶ 47.) Lofton's statement that PIA paid $720,000 in employee compensation was material to SBA's decision to deny forgiveness of the PIA PPP Loan.

### (5) Obligation

The False Claims Act defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment." 31 U.S.C. § 3729(b)(3).

Passive Income Advisors incurred an obligation to pay $1,199,999.00 to Greater Nevada Credit Union when Lofton signed the Promissory Note agreeing to pay back the PIA PPP Loan "subject to any Loan forgiveness." (SUF ¶ 26.) Lofton agreed that the Note was binding upon PIA and would "inure to the benefit of [Greater Nevada] and its successors and assigns," and the Note expressly contemplated that SBA may become the holder of the Note. (SUF ¶ 27.) While Greater Nevada provided the funds for the PIA PPP Loan, the loan was "100 percent guaranteed by SBA." 85 Fed. Reg. at 20812. "SBA's guarantee requires SBA to purchase its portion of the outstanding balance." 13 C.F.R. § 120.2(a)(iii). SBA issued rules clarifying that loan forgiveness was dependent on

compliance with PPP rules.  85 Fed. Reg. at 20813.  Following a thorough consideration, SBA denied PIA's loan forgiveness application.  (SUF ¶¶ 48–50.)

Accordingly, PIA owed an obligation to pay Greater Nevada (through its express grantor-grantee relationship) and an obligation to pay SBA (through its express or implied grantor-grantee relationship) as the guarantor of the PIA PPP Loan when it received the loan.  SBA purchased the PIA PPP Loan in full in March 2022, becoming the holder of the Note.  (SUF ¶ 54.)  There is no genuine dispute that PIA and Lofton owed and continue to owe an "obligation" to repay the PIA PPP Loan because it was not forgiven.

### B. Defendants are Liable under the Second Prong Because They Knowingly and Improperly Avoided an Obligation to Repay their PPP Loan.

The United States is also entitled to summary judgment under the second theory of liability, which requires evidence showing that "the defendant (1) concealed or improperly avoided or decreased an obligation to pay the government and (2) did so knowingly. (citations omitted)."  *U.S. ex rel. Ormsby v. Sutter Health*, 444 F. Supp. 3d 1010, 1056 (N.D. Cal. 2020).  This theory of liability does not require a showing "that the defendant used a false record or statement or that a record or statement was material."  *Id.* (citing *U.S. ex rel. Customs Fraud Investigations, LLC v. Victaulic Co.*, 839 F.3d 242, 255 (3d Cir. 2016)).

The False Claims Act defines an "obligation" as "an established duty, whether or not fixed, arising from an express or implied contractual, grantor-grantee, or licensor-licensee relationship, from a fee-based or similar relationship, from statute or regulation, or from the retention of any overpayment."  31 U.S.C. § 3729(b)(3).  "Avoidance" of an obligation under the reverse False Claims Act provision "includes behavior where an individual is put on notice of a potential issue, is legally obligated to address it, and does nothing."  *U.S. ex rel. Kane v. Healthfirst, Inc.*, 120 F. Supp. 3d 370, 394 (S.D.N.Y. 2015).  "Knowingly"

includes acting with "actual knowledge of the information" and requires "no proof of specific intent to defraud."  31 U.S.C. § 3729(b)(1).

As discussed above, PIA owed an obligation to Greater Nevada and SBA through the fully guaranteed PPP loan.  Defendants were informed by SBA at multiple points that the PIA PPP Loan was not eligible for forgiveness and that Defendants would need to begin making payments on the loan.  Defendants were first informed by SBA through the loan servicer that additional documentation of payroll before and after the PIA PPP Loan was received was necessary on July 23, 2021.  (SUF ¶ 48.)  SBA repeatedly requested more information before ultimately denying forgiveness on February 2, 2022.  (SUF ¶ 49.)  Defendants were again informed of the denial on May 10, 2022, after the loan had been purchased by SBA.  (SUF ¶ 50.)  Defendants admit to retaining the PIA Loan despite being informed by SBA that the loan was not eligible for forgiveness.  (SUF ¶¶ 51–53.)

Defendants were then informed by Treasury that they owed a debt to the United States based on the unpaid PPP loan funds.  (SUF ¶ 56.)  Lofton admitted to receiving this notice and responding with a demand that the United States pay her an additional $3,000,000 for her attention and stop contacting her.  (SUF ¶¶ 57–59.)  Defendants had actual knowledge that they owed an obligation to pay the government and that SBA denied forgiveness of the loan, but they continued to avoid their responsibility to pay.  (SUF ¶¶ 57–59.)  Accordingly, the United States is entitled to summary judgment that Defendants knowingly and improperly avoided paying their obligation under 31 U.S.C. § 3729(a)(1)(G).

**III.  Summary Judgment is Warranted on the Common Law Claims.**

**A.  The United States is Entitled to Recover Under Payment by Mistake**

"[T]he common-law remedy of payment by mistake is available to the United States independent of its statutory remedies."  *United States v. Systron-Donner Corp.*, 486 F.2d 249, 251 (9th Cir. 1973).  The government may recover payments made by mistake from both the

direct recipient of the payment as well as individuals who benefitted from the payments. *United States v. Mead*, 426 F.2d 118, 124 (9th Cir. 1970). Where a defendant is "the active force in obtaining the payments and directly received the benefits of the payments, he now must return that portion of the total of the payments which was made by mistake." *Id.*

There is no genuine dispute of material fact that PIA was not eligible for the PIA PPP Loan and that the loan was wrongfully issued. Lofton admitted that PIA had no payroll at the time of the application, rendering PIA ineligible for the loan in the first place. (SUF ¶¶ 3, 14, 49–50.) Lofton was the primary force behind PIA's loan application, and she received the benefit of the PIA PPP Loan as its sole owner. (SUF ¶¶ 5, 8.) The United States is therefore entitled to recover the value of the PIA PPP Loan from Lofton and PIA.

**B.  The United States is Entitled to Recover Under Unjust Enrichment**

The elements of unjust enrichment under federal common law require the plaintiff to show that "(1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *U.S. ex rel. Landis v. Tailwind Sports Corp.*, 234 F. Supp. 3d 180, 205 & n.15 (D.D.C. 2017) (quoting *In re APA Assessment Fee Litig. v. APA*, 766 F.3d 39, 45–46 (D.C. Cir. 2014)).

There is no genuine dispute of material fact that the United States conferred a benefit on Defendants of $1,199,999. SBA authorized Greater Nevada to issue the PIA PPP Loan, and SBA later purchased the loan. (SUF ¶¶ 4, 54.) Lofton and PIA have retained the benefit because they have not made any payments on the loan. (SUF ¶ 53.) Lofton and PIA's retention of the loan is unjust because they were not eligible to receive it. Lofton and PIA were informed of the terms of the PPP; they were informed that forgiveness was subject to compliance with those terms; and the United States denied forgiveness of the PIA PPP Loan. (SUF ¶¶ 2–3, 26, 49–50.) Under the agreed terms, Defendants are obligated to repay the loan. Congress intended the PPP to alleviate financial stress caused by the pandemic,

and Lofton admits to using the PIA PPP Loan to "increase [her] business," taking money for personal gain instead of using it to minimize harm from an economic disaster. (SUF ¶ 30.) The United States is entitled to repayment of the loan under common law.

## IV.    Calculation of Damages

"Ordinarily the measure of the government's damages [under the FCA] would be the amount that it paid out by reason of the false statements over and above what it would have paid if the claims had been truthful." *United States v. Mackby*, 339 F.3d 1013, 1018 (9th Cir. 2003) (quoting *United States v. Woodbury*, 359 F.2d 370, 379 (9th Cir. 1966)) (alteration in original). Thus, if a claim would not have been paid but for the falsity, the government's damages are the full value of the claim. *See id.* at 1019. Similarly, damages for a reverse false claim "consist of the difference between what the defendant should have paid the government and what the defendant actually paid the government." *Bourseau*, 531 F.3d at 1172. Here, Defendants should have paid the full value of the PIA PPP Loan. (SUF ¶ 53.)

The Government's damages start with the reimbursement for the fraudulently obtained loan. *See Mackby*, 339 F.3d at 1018 (damages are the total amount the Government paid because of the falsity). The burden then shifts to Defendants to prove any offsets, but there simply is no offset to a loan that would have never been made or forgiven. Defendants obtained $1,199,999 for the PIA PPP Loan and caused SBA to pay $35,999.97 in origination fees to Greater Nevada, for total single damages of $1,235,998.97. (SUF ¶¶ 25, 55). This amount trebled equals $3,707,996.91.

Each false claim, record, and statement is subject to a mandatory civil penalty. 31 U.S.C. § 3729(a)(1). FCA penalties "are adjusted upward for inflation under the Federal Civil Penalties Inflation Adjustment Act of 1990." *Cook Cnty. v. U.S. ex rel. Chandler*, 538 U.S. 119, 123 n.1 (2003). For penalties assessed after July 3, 2025, for violations that occur after November 2015, the statutory penalty is $14,308 to $28,619 per violation.

28 C.F.R. § 85.5.  In this case, there are at least two violations: the materially false loan application and the materially false forgiveness application.  The United States is entitled to summary judgment for three times the amount of the PIA loan plus the processing fee associated with that loan, which amounts to $3,707,996.91.  In addition, the United States requests the Court to enter two (2) civil penalties in an amount that it deems appropriate within the current statutory range.

## CONCLUSION

The United States has demonstrated that it is entitled to summary judgment on all counts for its False Claims Act claims under 31 U.S.C. § 3729(a)(1)(A), § 3729(a)(1)(B), and § 3729(a)(1)(G) and for its common law claims of payment by mistake and unjust enrichment.  The United States asks the Court to enter judgment in the amount of $3,707,996.91 plus two penalties in the range of $14,308 to $28,619 each.

Respectfully submitted this 7th day of August, 2025.

BRETT A. SHUMATE
Assistant Attorney General
Civil Division

*/s/ Patrick T. O'Hare*
JAMIE ANN YAVELBERG
COLIN M. HUNTLEY
JARED S. WIESNER
PATRICK T. O'HARE
Attorneys, Civil Division
U.S. Department of Justice

*Attorneys for the United States*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on August 7, 2025, I electronically transmitted the within and foregoing **PLAINTIFF UNITED STATES OF AMERICA'S MOTION FOR SUMMARY JUDGMENT** to the Clerk's Office using the CM/ECF System for filing and transmittal of a Notice of Electronic Filing to all CM/ECF registrants listed as counsel in this case.


                                        */s/ Patrick T. O'Hare*
                                        PATRICK T. O'HARE
                                        Trial Attorney, Civil Division